IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ANTOINETTE COLLIER, as Independent Administrator of the Estate of AAJAYAH M. RAY, Deceased,<br><br>         Plaintiff,<br><br>vs.<br><br>CITY OF MONONA, a Municipal Corporation; CITY OF MONONA POLICE DEPARTMENT, and SERGEANT ADAM NACHREINER, Individually and as an Employee of the CITY OF MONONA and CITY OF MONONA POLICE DEPARTMENT,<br><br>         Defendants. | Case No.  25-cv-1068<br><br>**Plaintiff Demands Trial by Jury** |

## **COMPLAINT AT LAW**

Now comes the Plaintiff, ANTOINETTE COLLIER, as Independent Administrator of the Estate of Aajayah M. Ray deceased, by and through her attorneys, GALLAGHER & KOSNER LAW LLC, and complaining of Defendants, CITY OF MONONA, a Municipal Corporation; CITY OF MONONA POLICE DEPARTMENT and SERGEANT ADAM NACHREINER, Individually and as an Employee of the CITY OF MONONA and CITY OF MONONA POLICE DEPARTMENT, and each of them states the following:

## **JURISDICTION AND VENUE**

1. This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983 and questions of federal constitutional law.

2. Venue is proper in the Western District of Wisconsin in that the events and conduct complained of herein all occurred in the Western District of Wisconsin. *See* 28 U.S.C.A. § 130.

## **FACTS COMMON TO ALL COUNTS**

**Background**

1

3.  On January 1, 2023, and at all times material, the decedent, Aajayah M. Ray ("Aajayah"), was a resident of the City of Chicago, Illinois. Aajayah was a nineteen year-old Black female with no criminal background.

4.  On January 1, 2023, and at all times material, the Plaintiff, Antoinette Collier ("Antoinette" or "Plaintiff") was the grandmother and court appointed independent administrator of Aajayah's estate and a resident of the City of Chicago, Illinois.

5.  On January 1, 2023, and at all times material, Defendant City of Monona ("City"), was a municipal corporation existing in Dane County, Wisconsin.

6.  On January 1, 2023, and at all times material, the City of Monona had an approximate population of 8,600 residents and covered 3.35 square miles. The eastern border of the City in terms of where this pursuit occurred was Monona Drive where it intersects with Pflaum Road. (See below City of Monona borders)



7.  On January 1, 2023, and at all times material, Defendant City maintained the Defendant City of Monona Police Department ("MPD"), which employed police officers who acted as the

actual agents and employees of the City of Monona and MPD.

8. On January 1, 2023, and at all times material, Defendant City and/or the MPD employed Defendant Sergeant Adam Nachreiner ("Sgt. Nachreiner"). Sgt. Nachreiner was a male white police officer.

9. On January 1, 2023, and at all times material, Dane County and/or the Dane County Sheriff's Office employed Sergeant Johnathon Matz ("Sgt. Matz"). Sgt. Matz was a male white police officer.

10. On January 1, 2023, the Defendants City and/or MPD, by and through its authorized agent and employee Sgt. Nachreiner, owned, operated, managed, maintained and/or controlled a covert and unmarked sports utility vehicle ("SUV").

11. On January 1, 2023, Sgt. Nachreiner's covert and unmarked SUV was a full size, four door, dark blue in color and had no outward emergency lights or law enforcement markings that would indicate to civilians that it was a police department vehicle. In fact, Sgt. Nachreiner's convert and unmarked SUV was intentionally designed to appear like a civilian SUV in order to maintain an element of surprise to civilians on the roadway.

12. On January 1, 2023, and at all times material, Rashad L. Nelson ("Nelson"), was a thirty year-old Black male. Upon information and belief, Nelson was the owner and operator of a 2021 four-door grey Tijuan Volkswagen ("Volkswagen") mid-size SUV.

13. On January 1, 2023, and at all times material, Aaron J. Willis ("Willis"), was a thirty year-old Black male and rear seat passenger of the Volkswagen.

14. On January 1, 2023, and at all times material, Aajayah was the front passenger of the Volkswagen.

15. On and before January 1, 2023, the MPD had various policies that governed their police

officers' conduct, including the conduct of Sgt. Nachreiner. MPD Policy 100.2 stated "'[i]t is the policy of the Monoma Police Department to limit its members to only exercise the authority granted to them by law." On and before January 1, 2023, the MPD Policy 100.3 allowed their police officers to "make arrests and enforce all local and state laws." MPD Policy 100.3.1 allowed their police officers "arrest authority within the jurisdiction of the Monoma Police Department … [w]hen the police officer has probable cause to believe any crime is being, or has been, committed."

16. On and before January 1, 2023, the MPD Policy 307.1 titled "Vehicle Pursuits" that stated "[v]ehicle pursuits expose innocent citizens, law enforcement officers and fleeing violators to the risk of serious injury or death… Another purpose of this policy is to minimize the potential for pursuit-related crashes. Vehicle pursuits require officers to exhibit a high degree of common sense and sound judgment. Officers *must not forget* that the immediate apprehension of a suspect is generally not more important than the safety of the public and pursuing officers." (emphasis added)

17. On and before January 1, 2023, the MPD Policy 307.1.1 stated "[o]fficers conduct during the course of a pursuit must be objectively reasonable, that is, what a reasonable officer would do under the circumstances. An individual's *unreasonable desire to apprehend a fleeing suspect at all costs has no place in professional law enforcement*." (emphasis added).

18. On and before January 1, 2023, the MPD Policy 307.2 allowed a police officer to initiate a "fresh pursuit" if the pursuing police officer "has probable cause to believe has violated any law or ordinance the officer is authorized to enforce." MPD Policies barred their officers from initiating a pursuit of a vehicle if that officer did not observe the driver/vehicle violate any "law or ordinance."

19. On and before January 1, 2023, the MPD Policy 307.8.3 stated "[a]ny pursuit intervention tactic, depending upon the conditions and circumstances under which it is used, may present

4

dangers to the officers, the public or anyone in or on the vehicle being pursued."

20. On and before January 1, 2023, the MPD policy considered "spike strips" or "stop sticks" to be a "pursuit intervention tactic" that presented an increased danger to anyone in a vehicle being pursued.

21. On and before January 1, 2023, all reasonably trained and experienced police officers - including Sgt. Nachreiner - were well aware that using stop sticks to stop or slow a fleeing vehicle that was traveling at speeds in excess of 30 mph posed a certain risk of death or life-threatening injury to the occupants of the fleeing vehicle.

22. On and before January 1, 2023, Defendant Sgt. Nachreiner had been a sworn police officer for approximately 20 years with three separate police departments, including being hired by the MPD as a police officer in 2009.

23. On and before January 1, 2023, Defendant Sgt. Nachreiner had been an "Emergency Vehicle Operations" instructor.

24. On and before January 1, 2023, Defendant Sgt. Nachreiner had been repeatedly trained and instructed that the United States Constitution, Wisconsin law, and all of the police department policies he was trained on, did not allow activate his emergency lights to stop a vehicle or allow him to engage in the pursuit of a vehicle that was not suspected of, or had not violated any codes, ordinances or laws.

25. On and before January 1, 2023, Defendant Sgt. Nachreiner had been repeatedly trained and instructed to immediately terminate a pursuit if the fleeing vehicle was not suspected of, or had not violated any codes, ordinances or laws and that vehicle had engaged in reckless driving at a high rate of speed placing the officer, the vehicle's occupants, and the public at risk of death or life-threatening injuries.

**Pursuit**

26. On January 1, 2023, at approximately 9:00 p.m., Defendant Sgt. Nachreiner was operating his covert and unmarked SUV in the proximately of St. Teressa Terrace and Monona Drive located in the eastern most section of the City. Defendant Sgt. Nachreiner's SUV was stationary and facing eastbound on St. Teressa Terrace where it intersects with Monona Drive.

27. At that time, Defendant Sgt. Nachreiner observed the Volkswagen driving southbound on Monona Drive and it crossed his line of vision. Defendant Sgt. Nachreiner observed the driver and front passenger of the Volkswagen to be black.

28. At that time, the Volkswagen that Nelson was operating had a valid license plate, had a valid registration sticker, had no code/ordinance violations, and Nelson had not committed any moving violations. In sum, Defendant Sgt. Nachreiner had absolutely no individualized and articulable "reasonable suspicion" that Nelson or his vehicle had violated any code, ordinance or law.

29. Any claim by Defendant Sgt. Nachreiner that the Volkswagen was acting "suspicious" is entirely baseless and contradicted by the officer's dash-camera video as detailed below. Instead, Defendant Sgt. Nachreiner's sole reason for following the Volkswagen was because the driver and/or front passenger were Black.

30. As the Volkswagen passed Defendant Sgt. Nachreiner, he turned southbound onto Monona Drive and accelerated in order to follow the Volkswagen towards the intersection of Nichols Road. The Volkswagen made a lawful stop at the intersection of Monona Drive and Nichols Road before turning right or eastbound on Nichols Road.

31. Defendant Sgt. Nachreiner also turned right or eastbound on Nichols Road, it was at this time that his dash-cam video's began to record. The Volkswagen can be seen in the video traveling

less than a block before activating its turn signal and turning into a parking lot. Nelson turned into the parking lot because he was concerned that a dark blue SUV with no outward emergency lights or law enforcement markings had accelerated towards them and was clearly following his vehicle. Nelson's actions under these circumstances were entirely understandable and in no way "suspicious" of any wrongdoing.

32. Defendant Sgt. Nachreiner followed the Volkswagen into the parking lot and came to a temporary stop. Defendant Sgt. Nachreiner's dash-cam video captured the Volkswagen making an extremely slow turn (approximately 1-2 mph) before slowly exiting the parking lot. The Volkswagen was approximately 20-25 feet from Defendant Sgt. Nachreiner's SUV as the vehicles passed each other. From this distance and at this speed, Defendant Sgt. Nachreiner could clearly see into the Volkswagen and he observed the driver and front passenger to be a younger Black male and female, respectively.

33. Defendant Sgt. Nachreiner's claim that the Volkswagen "accelerated rapidly towards" his SUV, "came within feet of striking" his vehicle, or drove "recklessly" back onto Nichols Road are blatant lies and directly refuted by his own dash-cam video.

34. At this time, Defendant Sgt. Nachreiner had absolutely no individualized and articulable "reasonable suspicion" to believe that Nelson or his vehicle had violated any code, ordinance, or law. In direct violation of the United States Constitution, Wisconsin law, and all of the police department policies he was trained over a twenty-year period, Defendant Sgt. Nachreiner activated his emergency lights in order to pull over the Volkswagen.

35. Over the next 13 seconds and as the SUV turned around in the parking lot, the Volkswagen is not in view of the dash-cam video but reappeared traveling eastbound on Nichols Road towards the intersection with Monona Drive. The Volkswagen is traveling at a normal rate of speed and is

only a half block ahead of the SUV. In fact, the Volkswagen's rear taillights flash red indicating that it was breaking to stop at the red traffic light at the intersection of Nichols Road and Monona Drive.

36. Once the traffic light for eastbound traffic turned green, the Volkswagen's break lights disappeared and the vehicle proceeded through the intersection of Monona Drive and proceeded eastbound onto Pflaum Road before entering the City of Madison, Wisconsin. Importantly - as indicated by the black mark below - the eastern border of the City of Monona ends just east of Monona Road on Pflaum Road. In other words, shortly after the Volkswagen crossed over Monona Road, Defendant Sgt. Nachreiner was required to terminate a pursuit that he was barred from initiating.



37. Once Defendant Sgt. Nachreiner's SUV and the Volkswagen exited the City of Monona both vehicles fell under the jurisdiction of the City of Madison and County of Dane.

38. On and before January 1, 2023, the Madison Police Department ("Madison PD") Standard Operating Procedure 4-4.003 barred its officers from initiating a vehicle pursuit unless the officer

had reasonable grounds to believe the suspect had or was attempting to commit a crime of violence, the suspect driver had a felony warrant for a crime of violence, or their conduct was so reckless as to be deemed an immediate threat to the general public if apprehension is delayed (eg. Driving While Under the Influence).

39. On and before January 1, 2023, the Dane County Sheriff's Office ("DCSO") Section 200.140 barred its officers from initiating a pursuit in an unmarked squad car unless the officer had reasonable grounds to believe the suspect had or was attempting to commit a felony.

40. On January 1, 2023, Defendant Sgt. Nachreiner's conscious decision to initiate the pursuit of the Volkswagen was barred under both the Madison PD and DCSO vehicle pursuit policies.

41. Approximately one and a half minutes into the pursuit, Defendant Sgt. Nachreiner was informed by dispatch that the vehicle was owned by Nelson, was not reported stolen, and there were no warrants or officer safety alerts associated with Nelson or the vehicle. As a result, Defendant Sgt. Nachreiner had yet additional information mandating that he terminate a pursuit that he was barred from initiating.

42. Defendant Sgt. Nachreiner continued to pursue the Volkswagen driving through stoplights, stop signs, driving on the wrong side of the road, and driving at speeds in excess of 100 mph. The entire pursuit lasted approximately four minutes and traveled approximately 5 miles.

43. Approximately two minutes into the pursuit, Defendant Sgt. Nachreiner ordered that "stop spikes" be deployed by the assisting officers despite knowing that the Volkswagen had been traveling in speeds in excess of 100 mph, and despite knowing that the use of stop sticks to stop or slow a fleeing vehicle that was traveling at speeds in excess of 30 mph posed a certain risk of death or life-threatening injury to the occupants of the fleeing vehicle.

44. As the Volkswagen approached the intersection of Femrite Drive and County Highway AB

in the Village of Cottage Grove, Defendant Sgt. Nachreiner was informed by police radio and/or dispatch that an assisting DCSO officer had deployed stop sticks at the intersection in an attempt to stop the Volkswagen. Defendant Sgt. Nachreiner was also directly behind the Volkswagen and observed it travelling in excess of 80 mph.

45. From the time Defendant Sgt. Nachreiner ordered the stop sticks be deployed, until the Volkswagen approached the intersection of Femrite Drive and County Highway AB, Defendant Sgt. Nachreiner was aware that if the Volkswagen struck the stop sticks at a high rate of speed the passengers would face certain risk of death or life-threatening injuries.

46. Predictably, the Volkswagen struck the stop sticks, lost control, and struck a tree(s) at such a high rate of the speed that the vehicle exploded in a ball of flame.

47. On January 4, 2023, Defendant Sgt. Nachreiner was interviewed by Wisconsin Department of Justice investigators regarding his conduct prior to and during the pursuit. During the interview, Defendant Sgt. Nachreiner proceeded to tell several blatant lies regarding the Volkswagen's action prior to the pursuit, lies that were directly contradicted by his own dash-cam video.

48. Defendant Sgt. Nachreiner's lied regarding the Volkswagen's actions prior to the pursuit in an attempt to justify a pursuit that he knew violated the United States Constitution, Wisconsin law, and all of the police department policies he was trained on over the last twenty years. Namely, Defendant Sgt. Nachreiner knew that the United States Constitution, Wisconsin law, and all of the police department policies he was trained on did not allow him to pull over or subsequently engage in the pursuit of a vehicle that was not suspected of, or had not violated any codes, ordinances or laws.

## COUNT I

**(Civil Rights Violation under §1983, Due Process, and State Created Danger as to all Defendants)**

1-48. Plaintiff re-pleads and re-alleges paragraphs 1 through 48 and hereby incorporates them as paragraphs 1-48 of Count I of the Complaint.

49. On and before January 1, 2023, Defendant Sgt. Nachreiner had been explicitly trained over a 20 year career in law enforcement that he was barred from activating his emergency lights to stop or engaging in the pursuit of a vehicle that was not suspected of, or had not violated any codes, ordinances or laws. Based on these decades of training and experience, Defendant Sgt. Nachreiner had more than sufficient time to "deliberate" when he made the conscious decision to activate his emergency lights and then initiate his pursuit of the Volkswagen.

50. Once Defendant Sgt. Nachreiner made the conscious decision to initiate the pursuit in violation of all training and experience he received over decades; he continued to have approximately four minutes to "deliberate" and decided to terminate a pursuit that he was barred from initiating.

51. Instead, Defendant Sgt. Nachreiner's conduct showed "deliberate indifference" and/or "shocked the conscious" while engaging in a "State Created Danger" in one of following respects:

    a.    Activated his emergency lights in order to stop a vehicle based on the driver/occupants' race instead of any individualized, articulable, or reasonable suspicion of wrongdoing;

    b.    Initiated a pursuit of a vehicle in violation of his decades of training and experience that barred him from initiating a pursuit without observing or suspecting the vehicle of violating any codes, ordinances, or laws;

    c.    Continuing the pursuit of a vehicle outside of his jurisdiction in violation of his decades of training and experience that barred him from initiating a pursuit without observing or suspecting the vehicle of violating any codes, ordinances, or laws;

    d.    Failing to terminate a pursuit that he was barred from initiating despite the risk posed to innocent passengers;

    e.    Ordered the use of stop sticks despite knowing that vehicles traveling at speeds in excess of 30 mph posed a certain risk of death or life-threatening injury to the occupants of the fleeing vehicle;

    f.    Failing to order the stop sticks removed despite knowing that vehicles traveling at speeds in excess of 30 mph posed a certain risk of death or life-threatening injury to the occupants of the fleeing vehicle;

  g. Knowingly lying about the vehicles conduct in an attempt to justify a pursuit he was barred from initiating.

52. As a direct and proximate result of Defendant Sgt. Nachreiner's unconstitutional acts and unlawful conduct as aforesaid, the Estate of Aajayah M. Ray sustained great pecuniary loss in the form of burial expense, funeral expense, future support, love, care and affection, and other damages.

WHEREFORE, Plaintiff prays for awards against all Defendants of compensatory and punitive damages, administrative costs and expenses, attorneys' fees and costs and all other damages recoverable against the Defendants under 42 U.S.C. § 1983, and all other just and proper relief.

                Respectfully submitted,

          By:  _____
                One of Plaintiff's Attorneys

Michael L. Gallagher
Gallagher Law Offices, LLC
ARDC#: 6281432
161 N. Clark Street, Suite 2060
Chicago, IL 60601
(312) 910-5050
mlg@gallagherinjurylaw.com